UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| TIMOTHY  ELLIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 1:15-cv-00306-JMS-MJD |
| | ) | |
| AMERICOLD LOGISTICS, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER ON MOTION FOR SUMMARY JUDGMENT

Presently pending before the Court is Defendant Americold Logistics, LLC's ("Americold"), Motion for Summary Judgment, [Filing No. 48], on all of Plaintiff Timothy Ellis' claims stemming from his employment at Americold, [Filing No. 1; Filing No. 41].  Mr. Ellis opposes Americold's motion. [Filing No. 61.]  For the reasons that follow, the Court grants in part and denies in part Americold's Motion for Summary Judgment.  [Filing No. 48.]

## I.
### STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits.  Fed. R. Civ. P. 56(c)(1)(A).  A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1)(B).  Affidavits or declarations must be made on personal knowledge, set out facts that would be

admissible in evidence, and show that the affiant is competent to testify on matters stated.  Fed. R. Civ. P. 56(c)(4).  Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment.  Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision.  A disputed fact is material if it might affect the outcome of the suit under the governing law.  *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009).  In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative.  *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005).  Fact disputes that are irrelevant to the legal question will not be considered.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events.  *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003).  The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party.  *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009).  The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor.  *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008).  It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder.  *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).  The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson*, 325 F.3d at 898.  Any doubt as to the

2

existence of a genuine issue for trial is resolved against the moving party.  *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

## II.
### RELEVANT BACKGROUND

The following statement of facts was evaluated pursuant to the standards set forth above. That is, the facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to Mr. Ellis as the non-moving party, drawing all reasonable inferences in his favor.  *See Reeves v. Sanderson Plumbing Products, Inc*., 530 U.S. 133, 150 (2000).

### A.  Mr. Ellis' Employment and Applicable Americold Policies

On November 29, 2012, Americold extended an offer to Mr. Ellis for the position of Lift Truck Operator Warehouse Worker ("LTO Warehouse Worker") at its Indianapolis facility. [Filing No. 48-3 at 2.]  Mr. Ellis accepted Americold's offer and began working as an associate LTO Warehouse Worker on January 7, 2013.  [Filing No. 48-2 at 5; Filing No. 48-4 at 2.]  Mr. Ellis was a member of the Teamsters Local Union No. 135 (the "Union") while he worked at Americold.  [Filing No. 48-2 at 13.]  As a member of the Union, Mr. Ellis was subject to the Collective Bargaining Agreement (the "CBA") between Americold and the Union.  [Filing No. 48-4.]  As relevant to this litigation, the CBA provides as follows:

Section 1.  Associates must furnish the Employer with their address and telephone number immediately upon employment.  Thereafter, the associate shall enter any change in their address or telephone number into the Kiosk, were available.  A failure to furnish such change shall relieve the Employer of any obligation to provide notice to the associate under any recall or other provisions of this Agreement.

Section 2.  If the Employer is required to give notice to associates under any provisions of this Agreement, the notice will be given by any verifiable means including, but not limited to, certified, return receipt required mail to the associate's last known address, verified telephone call to the associate at their last known telephone number, or e-mail transmission with return receipt acknowledgement.  If the associate fails to respond to the notice or message relayed by the Employer within three (3) days, the Employer's obligation to the employment under this Agreement ceases.

[Filing No. 48-4 at 11-12.]  Employees had access to the software to update their phone number and address both on and off-site.  [Filing No. 48-6 at 5.]

On Mr. Ellis' first day of employment, he filled out a personal data form with his contact information.  [Filing No. 48-7 at 2.]  Mr. Ellis had other phone numbers during his employment with Americold, but he does not recall if he provided Americold his updated contact information. [Filing No. 48-2 at 9-10; Filing No. 48-2 at 27.]  Americold has no record of Mr. Ellis ever updating his contact information.  [Filing No. 48-4 at 3.]

Mr. Ellis worked the third shift at Americold's Indianapolis facility.  [Filing No. 48-2 at 13.]  Two of his supervisors were Chris Vaughn and Chris Livengood, [Filing No. 48-2 at 12], and the General Manager of the facility was Brent Bilquist, [Filing No. 48-4 at 2].  From January 2013 until October 2013, the third shift consisted of four ten-hour days.  [Filing No. 48-4 at 3.]  Starting in November 2013, the third shift changed to five eight-hour days.  [Filing No. 48-4 at 3.]  In April 2013, the LTO Warehouse Worker job description identified as a requirement of the job that an employee "[o]ccasionally works overtime, evenings, or weekends in order to complete work or to attend meetings."[1]  [Filing No. 48-4 at 42.]  This meant that associate employees could be required

---

[1] Mr. Ellis correctly points out that the job description Americold cites as evidence supporting the essential nature of the ability to work overtime for the LTO Warehouse Worker position went into effect three months after Mr. Ellis began working for Americold.  [Filing No. 48-4 (dated April 2013).]  Because Americold has not cited evidence of the job requirements before this point, the Court cannot and does not conclude as a matter of law that working overtime in the manner Americold contends was an essential function of Mr. Ellis' position.  [Filing No. 49.]

4

to work more than twelve hours in a given shift or more than four shifts per week.  [Filing No. 48-4 at 3-4; *see also* Filing No. 48-4 at 20 (CBA provision, stating that "[d]aily overtime work is confined to associates in each job classification.  The Employer retains sole discretion to determine in each instance if overtime work is required. . . .  Associate(s) will not leave work in the middle of an assignment unless excused by management.  Daily overtime required of associates not performing an assignment will be by seniority by shift and will be offered on a volunteer basis.").]

Americold had an Attendance Policy setting forth its expectations of its associates and assigned "occurrences" based on various absence issues.  [Filing No. 48-4 at 45-46.]  The Attendance Policy also designated the disciplinary actions that would be taken based on the number of occurrences an associate had.  [Filing No. 48-4 at 46.]  After one occurrence, the associate receives a verbal reminder and review of the policy.  [Filing No. 48-4 at 46.]  After two occurrences, the associate receives the first written warning.  [Filing No. 48-4 at 46.]  After three occurrences, the associate receives the second written warning and a two-day suspension without pay.  [Filing No. 48-4 at 46.]  After four occurrences, the associate is eligible for termination pending final approval.  [Filing No. 48-4 at 46.]  Taking approved leave, including documented leave through the Family Medical Leave Act ("FMLA"), does not count as an absence warranting an occurrence.  [Filing No. 48-4 at 45.]

Mr. Ellis signed an Associate Acknowledgment form when he began working at Americold, confirming that he had read and understood the Attendance Policy.  [Filing No. 48-8 at 2.]  If an employee did not show up for work or was tardy, Mr. Vaughn and Mr. Livengood— Mr. Ellis' supervisors—would notify the human resources department and it would determine whether discipline was appropriate.  [Filing No. 48-6 at 4 (Mr. Vaughn's deposition); Filing No. 48-5 at 3-4 (Mr. Livengood's deposition).]

**B. Mr. Ellis' Disability**

Mr. Ellis alleges that his disability is sleep apnea.  [Filing No. 48-2 at 6.]  In June 2013, Mr. Ellis consulted with Dr. Shalini Manchanda regarding sleep issues.  [Filing No. 48-2 at 28.] He did a sleep study and had a follow up.  [Filing No. 48-2 at 29.]  On June 18, 2013, Dr. Manchanda gave Mr. Ellis the following note:

To: Whomsoever it may concern

Re: Timothy Ellis

Mr. Timothy Ellis is under my care for a sleep disorder. It is extremely important that he work only four twelve hour shifts a week. This will allow him to get the required amount of sleep that is required for health reasons.

Please contact my office if you have any questions.  Please be aware that we can only release information if you have consent from the patient.

Sincerely

S. Manchanda, MD

[Filing No. 48-19 at 2.]

Mr. Ellis believes that he gave the note to Mr. Vaughn and Mr. Livengood on June 19, 2013.  [Filing No. 48-2 at 30.]  Mr. Ellis says that when he gave Mr. Livengood the note, Mr. Livengood's reaction was that "in so many words he said that people like me, in the twenty-four years he had been there, they get people like me out of here."  [Filing No. 48-2 at 25.]  Mr. Ellis claims that Mr. Vaughn told him that Mr. Ellis' request for the accommodation set forth in the letter was "granted."  [Filing No. 48-2 at 30.]  Mr. Ellis checked with Mr. Vaughn on the status of the accommodation request two days later, and he was told to just work forty-eight hours per week

until he heard something else.  [Filing No. 48-2 at 31.]  There were times after that when Mr. Ellis worked more than forty-eight hours per week.[2]  [Filing No. 48-2 at 40.]

Mr. Vaughn later told Mr. Ellis that a copy of the doctor's note had been misplaced.  [Filing No. 48-2 at 31.]  Mr. Ellis gave a second copy of the doctor's note to either Mr. Vaughn or human resources.  [Filing No. 48-2 at 30.]  Human resources directed Mr. Ellis to contact CIGNA, Americold's FMLA and disability leave vendor.  [Filing No. 48-2 at 32.]  Mr. Ellis contacted CIGNA, [Filing No. 48-2 at 32; Filing No. 48-2 at 32-33], and he tried to file a claim on approximately August 6, 2013, [Filing No. 48-4 at 6; Filing No. 48-2 at 33].  Mr. Ellis believes that CIGNA told him that he would not qualify for anything, [Filing No. 48-2 at 33], and he never completed the form, [Filing No. 48-4 at 6].

At some point, Mr. Ellis had a phone conversation with some members of human resources and his doctor's office.  [Filing No. 48-2 at 34.]  At the end of the call, a woman from human resources told him that "we are not going to accommodate you."  [Filing No. 48-2 at 34.]  After that meeting, on September 9, 2013, Mr. Livengood gave Mr. Ellis an Associate Accommodation Form, requesting additional information from Mr. Ellis and his physician regarding Mr. Ellis' medical condition and the resulting limitations.  [Filing No. 48-2 at 33-34; Filing No. 48-21; Filing No. 48-4 at 6.]  Mr. Ellis only received the first page of the form and Mr. Livengood told him that he would receive instructions from human resources "the next day or the day after."  [Filing No. 48-2 at 33.]  He never received any instructions.  [Filing No. 48-2 at 33.]  A woman from human resources later told him Mr. Ellis that the form "was a preliminary thing" but "they indicated to

---

[2] While Americold asserts that Mr. Ellis overestimates the number of times that happened, it does admit that Mr. Ellis worked more than forty-eight hours per week on three occasions after the doctor's note in June 2013.  [Filing No. 49 at 13.]

me that this would not matter . . . that I would not receive accommodations." [Filing No. 48-2 at 33-34.]

Americold never received a completed Associate Accommodation Form from Mr. Ellis. [Filing No. 48-4 at 6.]  Mr. Ellis contacted Mr. Bilquist about it in October 2013, but Mr. Bilquist said it was too late to complete the form.  [Filing No. 48-2 at 34-35.]

### C.  Mr. Ellis' Attendance Issues

On March 6, 2013, Mr. Ellis received one occurrence—warranting a verbal reminder and review of the attendance policy—for being tardy one day and leaving early with no available sick time another day.  [Filing No. 48-9 at 2.]  On July 8, 2013, Mr. Ellis received a second occurrence—warranting a first written warning—for calling in without ten hours of sick time available. [Filing No. 48-10 at 2.] Mr. Ellis was again cited for tardiness on July 24, 2013, but he filed a grievance contending that there was an issue with his timecard and the potential third occurrence was rescinded.  [Filing No. 48-11 at 2; Filing No. 48-2 at 16-17.] Mr. Ellis was cited on October 25, 2013 for not calling in or showing up for his shift, but he successfully grieved the matter because he believed that Mr. Bilquist had approved his absence.  [Filing No. 48-12 at 2; Filing No. 48-2 at 17-18.]

On January 3, 2014, Mr. Ellis received an occurrence for calling in sick to work on October 31, 2013, and December 26, 2013, without enough sick time available.  [Filing No. 48-13 at 2.] The counseling form listed it as his third occurrence, requiring a second written warning and two-day unpaid suspension.  [Filing No. 48-13 at 2.]  Mr. Ellis questioned Mr. Livengood about this disciplinary action, Americold reviewed it, and he was not suspended.  [Filing No. 48-2 at 19.]

On January 9, 2014, Mr. Ellis called in to report he would not be at work.  [Filing No. 48-2 at 19; Filing No. 48-14 at 2.]  On January 13, 2014, Mr. Ellis was issued a counseling form

because he did not have sick time available for the absence. [Filing No. 48-14 at 2.] The form cited it as his fourth occurrence, making him eligible for termination pending final approval. [Filing No. 48-14 at 2.] The form was signed by Mr. Ellis, a Union representative, and Mr. Livengood. [Filing No. 48-14.] Mr. Livengood gave the form to Mr. Ellis, [Filing No. 48-5 at 5-6], and Mr. Ellis was suspended pending Americold's final determination regarding his termination for attendance issues, [Filing No. 48-4 at 4; Filing No. 48-15 at 2; Filing No. 48-16 at 2].

### D. Events Leading to Mr. Ellis' Termination

Upon further review, Americold realized that it had miscalculated Mr. Ellis' attendance points. [Filing No. 48-15 at 2; Filing No. 48-16 at 2.] Specifically, it was determined that an error had been made because Mr. Ellis' one-year anniversary with Americold was a few days before his January 9, 2014 absence, which resulted in him having the necessary sick time available for his absence. [Filing No. 48-4 at 4-5.] As a result, Americold did not terminate Mr. Ellis' employment. [Filing No. 48-15 at 2; Filing No. 48-16 at 2.]

Jeremy Deenik, Americold's facility human resources manager, called Mr. Ellis' phone number on file to inform him of the error and ask him to return to work. [Filing No. 48-4 at 5.] Union Stewards also telephoned Mr. Ellis to have him return to work. [Filing No. 48-15 at 2; Filing No. 48-16 at 2.] Mr. Ellis did not return any of the phone calls. [Filing No. 48-4 at 5; Filing No. 48-15 at 2; Filing No. 48-16 at 2.]

On or around January 20, 2014, Mr. Ellis filed a grievance. [Filing No. 48-15 at 3; Filing No. 48-16 at 3.] The hearing for Mr. Ellis' grievance was set for January 23, 2014, but Mr. Ellis failed to attend. [Filing No. 48-4 at 5; Filing No. 48-15 at 3; Filing No. 48-16 at 3.] Union Stewards and Americold management again tried to contact Mr. Ellis. [Filing No. 48-4 at 5; Filing

No. 48-15 at 3; Filing No. 48-16 at 3.]  A postponed grievance hearing was held on January 30, 2014, but Mr. Ellis again failed to attend.  [Filing No. 48-4 at 5; Filing No. 48-15 at 3; Filing No. 48-16 at 3.]

After Mr. Ellis failed to appear for the rescheduled grievance hearing, one of the Union Stewards concluded that the phone number Americold had for Mr. Ellis had been disconnected and that Mr. Ellis had not updated his contact information.  [Filing No. 48-15 at 3.]  He obtained an updated phone number for Mr. Ellis from another Union Steward, and the two Union Stewards called Mr. Ellis on that number and were able to reach him.  [Filing No. 48-15 at 3.]  Union Steward Brent Wolfe was present on that phone call.  [Filing No. 48-15 at 3.]  When he told Mr. Ellis about the grievance hearing, Mr. Ellis told him, "I will come in when I am damn good and ready."[3] [Filing No. 48-15 at 3.]  Mr. Wolfe told Americold management about that conversation and what Mr. Ellis said.  [Filing No. 48-15 at 3.]

On January 30, 2014, Mr. Bilquist made the decision to terminate, effective January 21, 2014.  [Filing No. 48-4 at 5.]  The decision "was based on his failure to return to work after Americold made multiple attempts to contact [Mr. Ellis] via his telephone number on file."  [Filing No. 48-4 at 5.]  Mr. Bilquist made the decision to terminate Mr. Ellis in consultation with Mr. Deenik and Anne Main, the Regional HR Director.  [Filing No. 48-4 at 6.]

---

[3] Mr. Ellis generally disputes having made this statement in his response brief but cites no evidence, including his deposition, as support for his dispute.  [See Filing No. 61 at 4.] "[S]ummary judgment may only be defeated by pointing to admissible evidence in the summary judgment record that creates a genuine issue of material fact, and it [is] not the district court's job to sift through the record and make [the non-movant's] case for him."  *United States v. 5443 Suffield Terrace, Skokie*, 607 F.3d 504, 510 (7th Cir. 2010).  While Mr. Ellis claims that Americold's evidence supporting this statement is "based upon inadmissible hearsay," [Filing No. 61 at 4], statements by a party opponent – here Mr. Ellis –are  not hearsay, Fed. R. Evid. 801(d)(2). Moreover, Americold cites Mr. Wolfe's affidavit as support for a statement made in the phone call to which Mr. Wolfe was a party and has personal knowledge.  Mr. Wolfe's affidavit is admissible evidence. [Filing No. 48-15 at 3.]

On January 31, 2014, Americold sent a letter to Mr. Ellis' home, advising him that his employment had been terminated effective January 21, 2014. [Filing No. 48-18 at 2.] The letter listed Mr. Ellis' "failure to return to work" as the reason for his termination. [Filing No. 48-18 at 2.] The letter informed him that he would be paid for the time he was suspended from January 13-20, 2014. [Filing No. 48-18 at 2.]

**E. Procedural History**

Mr. Ellis filed an EEOC charge on or about June 3, 2014, alleging that Americold failed to provide him a reasonable accommodation and unlawfully terminated him based on his alleged disability or in retaliation for his accommodation request. [Filing No. 48-22.] Mr. Ellis believes that Americold terminated him either because of his sleep apnea or because he requested an accommodation for his sleep apnea. [Filing No. 48-2 at 6.]

Mr. Ellis filed a Complaint against Americold in this Court on February 23, 2015. [Filing No. 1.] Mr. Ellis is pursuing claims pursuant to the Americans with Disabilities Act ("ADA"), specifically claims for failure to accommodate his disability, disability discrimination, and disability retaliation. [Filing No. 41.] Americold moves for summary judgment on all of Mr. Ellis' claims, [Filing No. 48], and Mr. Ellis opposes that motion, [Filing No. 61].

### III.
### DISCUSSION

Mr. Ellis asserts three claims pursuant to the ADA—disability discrimination, retaliation, and failure to accommodate. [Filing No. 41]. Various issues and arguments raised by the parties apply to each of his legal claims. Thus, the Court will begin by addressing the parties' arguments regarding Mr. Ellis' alleged disability before proceeding to the other merits of his claims.

### A.  Mr. Ellis' Alleged Disability

Mr. Ellis alleges that he is disabled for purposes of the ADA because he has sleep apnea. [Filing No. 48-2 at 6.]  Throughout their briefs, the parties disagree whether Mr. Ellis was disabled, whether Americold knew that Mr. Ellis was disabled, and whether Mr. Ellis was qualified to perform the essential functions of his job.  [Filing No. 49; Filing No. 61.]  Specifically, Americold argues that Mr. Ellis was not disabled because the doctor's note he submitted did not include a diagnosis and he did not contend that his sleep apnea affected his ability to work at Americold. [Filing No. 49.]  In response, Mr. Ellis emphasizes that the doctor's note he submitted to Americold directly linked his sleep disorder to the requested accommodation of only working four twelve-hour shifts a week.  [Filing No. 61; Filing No. 48-19.]

To prevail on an ADA claim, a plaintiff must show, among other things, that he is disabled as defined by the ADA.[4]  *Basden v. Prof'l Transp., Inc.*, 714 F.3d 1034, 1037 (7th Cir. 2013).  The ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  It defines the term "disability" as:  "(A) a physical or mental impairment that substantially limits one or more major life activities of the individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(1).  The type of "major life activities" that must be substantially limited include, among other things, "sleeping."  42 U.S.C. § 12102(2).  In order to prove he is disabled, a plaintiff "must provide sufficient evidence from which a reasonable jury

---

[4] While a plaintiff may also proceed under the theory that his employer regarded him as disabled, Mr. Ellis has disclaimed that argument.  [Filing No. 41 ("Plaintiff will proceed on the claim that he is an individual with a disability.  He will not proceed on the alternative theories that he was regarded as having a disability and that he had a record of disability.").]

could conclude that he was an individual with a disability within the meaning of the statute." *Silk v. Bd. of Trustees, Moraine Valley Cmty. Coll.*, 795 F.3d 698, 706 (7th Cir. 2015) (citation omitted).

It is undisputed that Mr. Ellis gave Americold a note from his doctor stating that he had a "sleep disorder" and that it was "extremely important that he work only four twelve hour shifts a week" to "allow him to get the required amount of sleep that is required for health reasons." [Filing No. 49 at 32 (admitting Americold received copy of Filing No. 48-19 at 2).] Americold contends that the doctor's note is not proof that Mr. Ellis is disabled as a matter of law because it does not identify Mr. Ellis' exact sleep disorder, which Americold contends limited its knowledge of any disability. [Filing No. 49 at 29.] The Court cannot agree with Americold for purposes of summary judgment. While Americold may not have known the exact nature of Mr. Ellis' sleep disorder, it is beyond dispute that the note identified a medical issue Mr. Ellis had, tied it to sleeping, and stated its impact on Mr. Ellis' job such that he should only work four twelve-hour shifts a week so that he could get the required amount of sleep for his health. [Filing No. 48-19.] The ADA specifically identifies "sleeping" as a major life activity that can render an individual disabled if it is substantially limited. 42 U.S.C. § 12102(2).

The Court cannot conclude as a matter of law on summary judgment that Mr. Ellis was not disabled for purposes of the ADA. Put another way, there is undisputed evidence in the record that Mr. Ellis presented Americold with a doctor's note that he had a health issue substantially affecting a major life activity for which he may need an accommodation at work.[5] While this

---

[5] While this evidence was sufficient to put Americold on notice of Mr. Ellis' sleep disorder and create an issue of material fact for summary judgment on the issue of his disability, the summary judgment analysis of Mr. Ellis' failure to accommodate claim hinges on other issues—such as the parties' engagement in the interactive process—that will be discussed in detail below.

evidence does not render him disabled as a matter of law, given the applicable standard of review at this stage of the litigation, the Court concludes that an issue of material fact exists regarding whether Mr. Ellis was disabled pursuant to the ADA.  Thus, the Court will proceed to the other elements of his ADA claims.

### B.  Discrimination and Retaliation Claims

Mr. Ellis contends that he was discriminated against because of his disability and retaliated against for requesting an accommodation for his disability.  [Filing No. 41; Filing No. 61.]  Mr. Ellis proceeds under the direct method of proof for his discrimination and retaliation claims.  [Filing No. 61 at 11-15 (discrimination claim only utilizing direct method of proof); Filing No. 61 at 19-23 (retaliation claim only utilizing direct method of proof).]  Because he relies on the same method of proof and both claims ultimately fail for the same reason, the Court will analyze them together.  *See Dickerson v. Bd. of Trustees of Cmty. Coll.*, 657 F.3d 595, 602 (7th Cir. 2011) (analyzing discrimination and retaliation claims together "because they fail for the same reason").

The ADA prohibits employers from discriminating against disabled employees because of their disability.  42 U.S.C. § 12112(a).  Employers are also "forbidden from retaliating against employees who raise ADA claims regardless of whether the initial claims of discrimination are meritless." *Dickerson*, 657 F.3d at 601.

To proceed under the direct method on a disability discrimination claim, plaintiff must show that (1) he is disabled within the meaning of the ADA, (2) he was qualified to perform the essential functions of the job with or without accommodation, and (3) he suffered an adverse action because of his disability.  *Hooper v. Proctor Health Care Inc.*, 804 F.3d 846, 853 (7th Cir. 2015).  To establish the third element, plaintiff must show that his disability was a "but for" cause of his termination.  *Id.*

14

To proceed under the direct method on a disability retaliation claim, plaintiff must show that (1) he engaged in a statutorily protected activity; (2) he suffered an adverse action; and (3) there is a causal connection between the two. *Cloe v. City of Indianapolis*, 712 F.3d 1171, 1180 (7th Cir. 2013). Requesting an accommodation is a statutorily protected activity. *Id.* To show causation under the direct method, plaintiff "must provide evidence that [his] requests for accommodations were a 'substantial or motivating factor' for [his] termination." *Id.* "It is well established that mere temporal proximity between the statutorily protected activity and the action alleged to have been taken in retaliation for that activity will rarely be sufficient in and of itself to create a triable issue." *Harper v. C.R. England, Inc.*, 687 F.3d 297, 308 (7th Cir. 2012); *see also Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000) ("Speculation based on suspicious timing alone ... does not support a reasonable inference of retaliation....").

To prove claims under the direct method, a plaintiff can present either direct or circumstantial evidence to meet his burden:

> Direct evidence requires an admission by the decision maker that his or her actions were based upon the prohibited animus. However, employers are usually careful not to offer overt remarks revealing discrimination, and circumstantial evidence that allows a jury to infer intentional discrimination is also permissible. The type of circumstantial evidence that a plaintiff may produce to survive summary judgment includes: (1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action.

*Dickerson*, 657 F.3d at 601. "Derogatory statements made by someone who is not involved in making the employment decision at issue are not evidence that the decision was discriminatory." *Rozskowiak v. Vill. of Arlington Heights*, 415 F.3d 608, 612 (7th Cir. 2005). Likewise, "stray remarks in the workplace . . . are insufficient to establish that a particular decision was motivated

15

by discriminatory animus," especially when they are not "in reference to the adverse employment action." *Hemsworth v. Quotesmith.com*, 476 F.3d 487, 491 (7th Cir. 2007) (citation omitted).

For purposes of ruling on this motion, as detailed above, the Court assumes that Mr. Ellis was disabled because of his sleep apnea as defined by the ADA. It is also undisputed that Mr. Ellis suffered an adverse employment action, given that Americold terminated his employment.[6] To succeed on both his disability discrimination and retaliation claims, however, Mr. Ellis must prove that his disability or requested accommodation was the cause of his termination. Unless he can point to "sufficient evidence of a causal link," his discrimination and retaliation claims will fail. *See, e.g.*, *Arroyo v. Volvo Grp. N. Am., LLC*, 805 F.3d 278, 287 (7th Cir. 2015).

To prove the causation element of his discrimination and retaliation claims, Mr. Ellis cites comments that he claims Mr. Livengood made when he gave him the doctor's note about his sleep disorder in June 2013. [Filing No. 61 at 13.] Mr. Ellis says that when he gave Mr. Livengood the note, Mr. Livengood's reaction was that "in so many words he said that people like me, in the twenty-four years he had been there, they get people like me out of here." [Filing No. 48-2 at 25.] Mr. Ellis also claims that Mr. Livengood told him that he would "never get FMLA [because he]

---

[6] Mr. Ellis only identifies his termination as the adverse employment action supporting his ADA claims. [Filing No. 41; Filing No. 61.] Mr. Ellis seems to contend that he was terminated on January 13, 2014, which is the date he was given his final occurrence. [Filing No. 41.] The Seventh Circuit has adopted an "unequivocal notice of termination" test to determine the date that an employee has been terminated. *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1061 (7th Cir. 2014). Under that test, "termination occurs when the employer shows, by acts or words, clear intention to dispense with the employee's services." *Id.* "First, there must be a final, ultimate, nontentative decision to terminate the employee.... Second, the employer must give the employee 'unequivocal' notice of its final termination decision." *Id.* While Mr. Ellis claims that Mr. Livengood told him that he was terminated when he gave him his final occurrence form on January 13, 2014, [Filing No. 48-2 at 20], that form clearly says that the occurrence made Mr. Ellis "eligible for Termination" and that it was "pending final approval," [Filing No. 48-14 at 2]. Pursuant to the unequivocal notice of termination test, Mr. Ellis was not terminated until January 30, 2014, after Americold sent him a letter unequivocally notifying him that he was terminated. [Filing No. 48-4 at 5-6; Filing No. 48-18 (termination notice).] Thus, the Court will use that date in its analysis.

16

would not be there long enough to get it." [Filing No. 48-2 at 25.] He emphasizes that he was terminated shortly after he completed one year of employment with Americold, which made him eligible for FMLA leave.[7] [Filing No. 61 at 13.] Mr. Ellis also points out that he successfully grieved multiple occurrences before his termination. [Filing No. 61 at 13.]

The parties disagree whether Mr. Ellis requested his accommodation seven months before his termination (Americold's position) or four months before his termination (Mr. Ellis' position). [Filing No. 49 at 23 (Americold's position emphasizing that Mr. Ellis was not terminated for seven months after he first gave Americold the doctor's note in June 2013); Filing No. 61 at 22 (Mr. Ellis' position emphasizing that he communicated with Mr. Bilquist as late as October 2013 about a possible accommodation).] The Court finds this disagreement immaterial for resolving Mr. Ellis' disability discrimination and retaliation claims because for purposes of analyzing the causation element of those claims, the key time period is the time between when Mr. Ellis was suspended on January 13, 2014 and when he was terminated on January 30, 2014.

The undisputed evidence during that time period is that after Mr. Ellis was suspended for his attendance-related occurrences, Americold realized that it had made a mistake and tried to recall him to work. [Filing No. 48-4 at 4.] Americold and various Union Stewards used the contact information Mr. Ellis had provided, which Mr. Ellis had a duty to update and could do either on or off-site. [Filing No. 48-4 at 11-12; Filing No. 48-6 at 5.] The CBA provided that an employee's failure to furnish updated contact information in the manner specified "shall relieve [Americold] of any obligation to provide notice to the associate under any recall or other provisions of [the CBA]." [Filing No. 48-4 at 11.] The CBA further provided that Mr. Ellis could be terminated for failing to respond to a notice or message relayed by Americold "within three (3) days," at which

---

[7] Mr. Ellis is not pursuing an FMLA claim. [Filing No. 41; Filing No. 64 at 8.]

point Americold's "obligation to the employment under [the CBA] ceases." [Filing No. 48-4 at 12.]  The undisputed evidence is that Americold and Union Stewards attempted to contact Mr. Ellis with the contact information he had provided pursuant to the CBA and that he failed to respond within three days.  [Filing No. 48-4 at 5-6; Filing No. 48-15 at 2-3; Filing No. 48-16 at 2-3.]  When a Union Steward was finally able to contact Mr. Ellis at a different number after he missed his second grievance hearing, Mr. Ellis told him, "I will come in when I am damn good and ready."  [Filing No. 48-15 at 3.]  The Union Steward communicated this comment to Mr. Bilquist, who then made the decision in conjunction with human resources to terminate Mr. Ellis "based on his failure to return to work." [Filing No. 48-4 at 5.]  On January 31, 2014, Americold sent a letter to Mr. Ellis' home, advising him that his employment had been terminated effective January 21, 2014.  [Filing No. 48-18 at 2.]  The letter listed Mr. Ellis' "failure to return to work" as the reason for his termination and informed him that he would be paid for the time he was suspended from January 13 to 20, 2014.  [Filing No. 48-18 at 2.]

Mr. Ellis tries to proceed under the direct method to support his disability discrimination and retaliation claims, but all of the evidence he cites precedes the crucial time period between when he was suspended and terminated in January 2013.  The comments he claims Mr. Livengood made in June 2013 regarding how his disability and request for an accommodation would be treated by Americold are too remote from the decision to terminate him in January 2013 to create an issue of material fact.  Even if they were not so remote, it is well established that mere temporal proximity "will rarely be sufficient in and of itself to create a triable issue."  *Harper*, 687 F.3d at 308; *see also Sauzek*, 202 F.3d at 918 ("Speculation based on suspicious timing alone ... does not support a reasonable inference of retaliation....").  Moreover, Mr. Livengood did not make the decision to terminate Mr. Ellis.  Mr. Bilquist made that decision in conjunction with members of

human resources.  [Filing No. 48-4 at 5-6.]  Statements made by someone who is not involved in making the employment decision at issue are not evidence that the decision was discriminatory. *Rozskowiak*, 415 F.3d at 612.

To succeed on either the disability discrimination or retaliation claims, Mr. Ellis must show that he suffered an adverse employment action for which his disability was a substantial or motivating factor.  *Hooper*, 804 F.3d at 853 (elements of discrimination claim); *Cloe*, 712 F.3d at 1180 (elements of retaliation claim).  Mr. Ellis relies on his termination to support both of these claims.  [Filing No. 41; Filing No. 61.]  Even considering all of the evidence in a light most favorable to Mr. Ellis, the Court finds that no reasonable factfinder could conclude that his disability or request for an accommodation was a substantial or motivating factor in his termination.  The undisputed evidence leading up to Mr. Ellis' termination shows that he was terminated for failing to return to work after Americold tried to recall him with the contact information he provided pursuant to the CBA, but that Mr. Ellis failed to respond.  When a Union Steward ultimately did talk to him, Mr. Ellis told him, "I will come in when I am damn good and ready."  [Filing No. 48-15 at 3.]  Because the undisputed evidence leads to one conclusion—that Mr. Ellis was terminated for his failure to return to work—the Court concludes that Americold is entitled to summary judgment on Mr. Ellis' disability discrimination and retaliation claims as a matter of law.

**C.  Failure to Accommodate Claim**

Americold contends that it is entitled to summary judgment on Mr. Ellis' failure to accommodate claim because it is time barred.  [Filing No. 49 at 26-27.]  Although Americold "disputes that it ever denied any request by Plaintiff for a reasonable accommodation," Americold cites Mr. Ellis' testimony that he worked more than 48 hours per week after requesting the

accommodation. [Filing No. 49 at 27.] Thus, Americold argues that Mr. Ellis' request was denied in June 2013 on the day it was received, which was more than 300 days before he filed an EEOC charge. [Filing No. 49 at 26-27.] Even if the failure to accommodate claim is timely, Americold contends that it is still entitled to summary judgment because Mr. Ellis was responsible for any breakdown in the interactive process.[8] [Filing No. 49 at 29-33.]

In response, Mr. Ellis argues that his failure to accommodate claim is timely. [Filing No. 61 at 15-16.] He also contends that Americold is responsible for not engaging in the interactive process because it "sent him down dead end alleys by having him call CIGNA, by giving him one page of an accommodation form without ever giving him any instruction on what to do with it, and then Bilquist tells him when he was finally able to inquire that he had missed a 15-day deadline to submit the form." [Filing No. 61 at 19.]

In reply, Americold reasserts that Mr. Ellis' failure to accommodate claim is time-barred, noting that he cannot specify the date on which his request was denied. [Filing No. 64 at 14.] Americold contends that even if it is timely, the failure to accommodate claim fails because

---

[8] The Court has already rejected additional arguments Americold made in the context of Mr. Ellis' other claims, such as that Mr. Ellis is not disabled or Americold was not aware of his disability. [Filing No. 49 at 27-29.] The Court will not readdress those arguments. Moreover, making all reasonable inferences in favor of Mr. Ellis in light of the Court's prior conclusions, the Court will assume that Mr. Ellis' proposed accommodation—working no more than four twelve-hour shifts per week—was reasonable. It does this in part because, as Mr. Ellis points out, the job description Americold submits in support of the essential nature of the overtime requirement went into effect after Mr. Ellis started working at Americold. [Filing No. 61 at 16-17 (citing Filing No. 48-4 at 42-43.] While Americold correctly points out that the job description predates Mr. Ellis' requested accommodation, [Filing No. 64 at 16], based on the evidence submitted on summary judgment, the Court finds that issues of material fact preclude it from granting summary judgment in favor of Americold on the reasonableness of the proposed accommodation as a matter of law, particularly in light of the Court's conclusions below that a jury could find that Americold did not engage in the interactive process.

Americold engaged in the interactive process by directing Mr. Ellis to CIGNA, trying to contact his doctor, and providing him the associate accommodation form.  [Filing No. 64 at 19-20.]

In order to bring a timely ADA claim, a plaintiff must first file an EEOC "charge within 300 days of the conduct underlying the claim." *Moore v. Vital Products, Inc.*, 641 F.3d 253, 256 (7th Cir. 2011).  The ADA provides that an employer must provide "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A).  A failure-to-accommodate claim requires the plaintiff to show that: "(1) [he] is a qualified individual with a disability; (2) the employer was aware of [his] disability; and (3) the employer failed to reasonably accommodate the disability." *Kotwica v. Rose Packing Co.*, 637 F.3d 744, 747-48 (7th Cir. 2011) (citation and quotation marks omitted).  "No adverse employment action is required to prove a failure to accommodate." *E.E.O.C. v. AutoZone, Inc.*, 630 F.3d 635, 638 (7th Cir. 2010) (citations omitted).

"After an employee has disclosed that [he] has a disability, the ADA requires an employer to engage with the employee in an 'interactive process' to determine the appropriate accommodation under the circumstances." *Spurling v. C & M Fine Pack, Inc*., 739 F.3d 1055, 1061 (7th Cir. 2014).  The employer "has the burden of exploring with the worker the possibility of a reasonable accommodation."  *Ozlowski v. Henderson*, 237 F.3d 837, 840 (7th Cir. 2001). Once an employee requests an accommodation, the employer must engage in a flexible interactive process to identify a reasonable accommodation.  *See Basden v. Prof'l Transp., Inc.*, 714 F.3d 1034, 1038 (7th Cir. 2013) (citing *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996)).  "[W]hile an employer's failure to engage in the interactive process alone is not an independent basis for liability, it is actionable 'if it prevents identification of an appropriate

21

accommodation for a qualified individual.'" *Spurling*, 739 F.3d at 1062 (quoting *Basden*, 714 F.3d at 1039).

Americold posits that unless it denied Mr. Ellis' accommodation request after August 7, 2013, his failure to accommodate claim is untimely. [Filing No. 49 at 26.] As Americold admits in making its arguments regarding the interactive process, however, it attempted to engage with Mr. Ellis about a possible accommodation after that date. [Filing No. 49 at 31-33.] For example, Mr. Bilquist attests that Mr. Ellis received an Associate Accommodation Form on September 6, 2013. [Filing No. 48-4 at 6.] Because the parties were still engaged in the interactive process less than 300 days before Mr. Ellis filed his EEOC charge, the Court cannot say as a matter of law that Mr. Ellis' failure to accommodate claim was untimely.

The evidence of record in support of Mr. Ellis' failure to accommodate claim is as follows. Mr. Ellis provided his supervisors with a doctor's note regarding his sleep disorder and the proposed accommodation on June 19, 2013. [Filing No. 48-2 at 30.] Mr. Livengood's reaction was that "in so many words he said that people like me, in the twenty-four years he had been there, they get people like me out of here." [Filing No. 48-2 at 25.] About a month later, Mr. Vaughn told Mr. Ellis that the doctor's note had been misplaced, [Filing No. 48-2 at 31], and Mr. Ellis submitted a second copy of the doctor's note, [Filing No. 48-2 at 30]. Human resources directed Mr. Ellis to contact CIGNA, Americold's FMLA and disability leave vendor. [Filing No. 48-2 at 32.] Mr. Ellis contacted CIGNA, [Filing No. 48-2 at 32; Filing No. 48-2 at 32-33], and he tried to file a claim on approximately August 6, 2013, [Filing No. 48-4 at 6; Filing No. 48-2 at 33]. Mr. Ellis believes that CIGNA told him that he would not qualify for anything, [Filing No. 48-2 at 33].

Mr. Ellis had a phone conversation with some members of human resources and his doctor's office. [Filing No. 48-2 at 34.] At the end of the call, a woman from human resources

22

told him that "we are not going to accommodate you." [Filing No. 48-2 at 34.] After that meeting, on September 9, 2013, Mr. Livengood gave Mr. Ellis an Associate Accommodation Form, requesting additional information from Mr. Ellis and his physician regarding Mr. Ellis' medical condition and the resulting limitations. [Filing No. 48-2 at 33-34; Filing No. 48-21; Filing No. 48-4 at 6.] Mr. Ellis only received the first page of the form, and Mr. Livengood told him that he would receive instructions from human resources "the next day or the day after." [Filing No. 48-2 at 33.] Mr. Ellis never received any instructions. [Filing No. 48-2 at 33.] A woman from human resources later told him Mr. Ellis that the form "was a preliminary thing" but "they indicated to me that this would not matter . . . that I would not receive accommodations." [Filing No. 48-2 at 33-34.] Americold never received a completed Associate Accommodation Form from Mr. Ellis. [Filing No. 48-4 at 6.] Mr. Ellis contacted Mr. Bilquist about it in October 2013, but Mr. Bilquist said it was too late to complete the form. [Filing No. 48-2 at 34-35.]

Making all reasonable inferences in favor of Mr. Ellis, which the Court must do when considering Americold's motion, the Court finds that issues of material fact preclude summary judgment in favor of Americold on Mr. Ellis' failure to accommodate claim. It is possible that a jury could find that based on the evidence of record, Americold's failure to engage in an interactive process resulted in a failure to identify an appropriate accommodation for Mr. Ellis. *See Rehling v. City of Chicago*, 207 F.3d 1009, 1016 (7th Cir. 2000) (holding that failure to engage in the interactive process alone is not enough but that the "plaintiff must allege that the employer's failure to engage in an interactive process resulted in a failure to identify an appropriate accommodation for the qualified individual"). For example, a jury could find significant the comments that Mr. Livengood made upon receiving the doctor's note; that Americold apparently lost the first doctor's note Mr. Ellis submitted; that a member of human resources told Mr. Ellis that he would not be

accommodated; that Mr. Ellis was only given the first page of the accommodation form and never received instructions regarding how to complete it, as he been told he would; that the general manager ultimately told him it was too late to submit the form; and that Americold never proposed an accommodation.   In light of this conclusion, the Court must deny summary judgment to Americold on Mr. Ellis' failure to accommodate claim.

To succeed on his failure to accommodate claim at trial, Mr. Ellis must prove all of the elements of the claim:  "(1) [he] is a qualified individual with a disability; (2) the employer was aware of [his] disability; and (3) the employer failed to reasonably accommodate the disability." *Kotwica*, 637 F.3d at 747-48.  If Mr. Ellis does prove these elements, he will be entitled to damages consistent with the ADA.  That said, based on the Court's conclusions with regard to the disability discrimination and retaliation claims, Mr. Ellis' damages cannot be based on his termination because the Court found in the context of his other claims that there is no dispute that his termination was not based on his disability or request for an accommodation.

## IV.
### CONCLUSION

For the reasons set forth herein, the Court **GRANTS IN PART AND DENIES IN PART** Americold's Motion for Summary Judgment.  [Filing No. 48.]  Specifically, summary judgment is entered in favor of Americold on Mr. Ellis' disability discrimination and retaliation claims but denied on his failure to accommodate claim.  If Mr. Ellis succeeds in proving his failure to accommodate claim at trial, he can recover damages for it consistent with the ADA but those damages cannot be based on his termination because the Court found in the context of his disability discrimination and retaliation claims that there is no dispute that his termination was not based on his disability or request for an accommodation.  The Court asks the assigned Magistrate Judge to

hold a conference with the parties to pursue the possibility of settlement.  No partial final judgment shall enter at this time.

Date:  7/18/2016

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Electronic Distribution via CM/ECF:**

Melissa K. Taft
JACKSON LEWIS P.C. - Indianapolis
melissa.taft@jacksonlewis.com

Robert W. Capobianco
JACKSON LEWIS PC (Atlanta)
capobiar@jacksonlewis.com

John H. Haskin
JOHN H. HASKIN & ASSOCIATES
jhaskin@jhaskinlaw.com

Paul Anthony Logan
JOHN H. HASKIN & ASSOCIATES
plogan@jhaskinlaw.com